**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA

v.

JOSEPH P. DONAHUE,

    Defendant.

3:11-CR-0033

(JUDGE CAPUTO)

## **MEMORANDUM**

Presently before the Court are Defendant Joseph P. Donahue's ("Mr. Donahue") Motion to Suppress all Evidence Seized Pursuant to Search of Car Seized in Violation of Fourth Amendment Rights (Doc. 41) and his Supplemental Motion to Suppress Evidence Obtained from Unlawful Search of Hotel Room, Unlawful Search and Seizure of Vehicle, and Unlawful Search of Closed Containers. (Doc. 98.) At the time Mr. Donahue was arrested, a warrant for his arrest had previously been issued based on his failure to surrender for service of a federal prison sentence after he was convicted of bank fraud, money laundering, unauthorized access device, and false statements. Because the warrant for Mr. Donahue's arrest was for his failure to surrender to commence service of his sentence of imprisonment on January 4, 2011, any search, and consequently, evidence seized, was without probable cause, and because the warrantless searches were not permissible under any exceptions to the warrant requirement and the inevitable discovery exception to the exclusionary rule does not apply in this case, Mr. Donahue's motions will be granted.

### **I. Relevant Factual Background**

Defendant, Joseph P. Donahue, failed to surrender to commence service of his sentence of imprisonment on January 4, 2011. Instead, he drove across the country to New

Mexico where he was arrested on January 20, 2011 by the United States Marshals Service in the parking lot of the Plaza Suites Hotel where he was a registered guest under the alias "Don Roberts."

Immediately prior to his arrest, Mr. Donahue was sitting in a 2002 Ford Mustang which belonged to his son. Mr. Donahue was summoned from the vehicle without incident and arrested. Upon arrest, Deputy U.S. Marshal Steven Archuleta conducted a search of Mr. Donahue, handcuffed him, and, after receiving direction from Deputy U.S. Marshal Sharon Summa of Scranton, Pennsylvania, seized the Ford Mustang. Deputy U.S. Marshal Archuleta searched the hotel room in which Mr. Donahue was staying, and seized the contents of two waste baskets. The Ford Mustang was then taken to the U.S. Marshals' facility in Las Cruces, New Mexico, where the car was searched, pictures of the vehicle and its contents were taken, and the contents of the car were inventoried pursuant to the United States Marshals Service Policy Directives. The contents of the vehicle were removed and placed in a secure area. The closed containers found in the Ford Mustang, however, were not opened and inventoried. The vehicle was then released to Bradley's Garage and 24 Hour Towing, a public tow yard. This occurred on January 20, 2011.

The next day, January 21, 2011, Senior Supervisory Agent Amy Willeke of the FBI was contacted by a Special Agent in Scranton, Pennsylvania about retrieving the Ford Mustang. Senior Supervisory Agent Willeke then retrieved the Ford Mustang from Bradley's. Before leaving Bradley's, Senior Supervisory Agent Willeke moved the driver's seat forward. She then drove the Ford Mustang to the FBI garage in Las Cruces, New Mexico. Later that day, Senior Supervisory Agent Willeke returned to the Ford Mustang with a camera to photograph the interior of the vehicle. When she opened the driver's door, she noticed a Glock .40 caliber magazine with an extender in an area that had been

covered by the seat before she had moved the seat forward.[1]  In the vehicle was also paperwork and a C.D. over the passenger side visor.  Thereafter, she had the Ford Mustang x-rayed to ensure that no other contraband had been concealed in the vehicle.

Senior Supervisory Agent Willeke subsequently instructed Special Agent Alfredo Viera to retrieve the items that the United States Marshals Service had seized, inventory those items, and facilitate having those items transferred to Scranton, Pennsylvania. On January 25, 2011, Deputy U.S. Marshal Archuleta and Special Agent Viera emptied the bags which had been removed from the Ford Mustang on January 20, 2011.  In one of the bags, inside a rag inside a boot, a Glock semi-automatic pistol was found.  The contents of the bags were inventoried by both Deputy U.S. Marshal Archuleta and Special Agent Viera. The United States Marshals Service Policy Directives does not address the emptying of closed containers during an inventory search, however, the FBI's Inventory Policy provides that any containers, whether locked or unlocked, should be promptly and thoroughly inventoried.

After the contents of the bags were inventoried, the FBI took custody of the evidence seized from the Ford Mustang by the United States Marshals Service.

Mr. Donahue was charged with knowingly failing to surrender for service of a federal sentence pursuant to a court order in violation of 18 U.S.C. § 3146(a)(2) and (b)(1)(A)(i); knowingly possessing, in and affecting commerce, a firearm (Glock, Model 27, .40 caliber semi-auto pistol, serial number GTB989) which had been shipped and transported in interstate and foreign commerce in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); being a fugitive from justice and knowingly possessing, in and affecting commerce, a firearm

---

[1] After discovering the magazine, Supervisory Special Agent Willeke confirmed with Deputy U.S. Marshal Archuleta that neither he nor any other law enforcement officers had lost a magazine the day before while searching the Ford Mustang.

3

(Glock, Model 27, .40 caliber semi-auto pistol, serial number GRB989) which had been shipped and transported in interstate and foreign commerce, in violation of 18 U.S.C. §§ 922(g)(2) and 924(a)(2); and, knowingly possessing a stolen firearm (Glock, Model 27, .40 caliber semi-auto pistol, serial number GTB989) which had been shipped and transported in interstate and foreign commerce, knowing and having reasonable cause to believe the firearm was stolen in violation of 18 U.S.C. §§ 922(j) and 924(a)(2) as a result of the arrest and search noted above.

Mr. Donahue now moves to suppress the evidence seized, contending the searches of the hotel room, the Ford Mustang, and the containers found inside the Ford Mustang were unreasonable under the Fourth Amendment to the United States Constitution. A suppression hearing was held on September 25, 2013, following which the parties were afforded time to file supplemental briefs. Mr. Donahue's suppression motions are now ripe for disposition.

## II. Discussion

The Fourth Amendment guarantees that: "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend IV. "What is reasonable depends upon all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." *United States v. Montoya de Hernandez*, 473 U.S. 531, 537, 105 S. Ct. 3304, 87 L. Ed. 2d 381 (1985).

Mr. Donahue seeks suppression of evidence seized from his hotel room, vehicle, and the closed containers within his vehicle. The Government contends that Mr. Donahue lacks standing to challenge the searches of the hotel room and Ford Mustang. However, the

4

Government argues that even if Mr. Donahue has standing to challenges these searches, they were permissible pursuant to the automobile or inventory exceptions to the warrant requirement. The Government also asserts that any unlawfully obtained evidence need not be suppressed pursuant to the inevitable discovery exception to the exclusionary rule.

### A.    Standing to Challenge the Searches

The threshold issue raised by the Government is whether Mr. Donahue has standing to challenge the searches of the hotel room and Ford Mustang. A defendant challenging a search and seizure based upon the Constitution's Fourth Amendment bears the burden of showing standing, *i.e.*, establishing that the government violated his or her own rights. *Rakas v. Illinois*, 439 U.S. 128, 130 n. 1, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978). "Standing to challenge a search requires that the individual challenging the search have a reasonable expectation of privacy in the property searched, . . . and that he manifests a subjective expectation of privacy in the property searched." *United States v. Baker*, 221 F.3d 438, 441 (3d Cir. 2000) (citations and internal citations omitted).

#### 1.    The Hotel Room

It is well-settled that "[f]rom the overnight guest's perspective," the expectation of privacy in a hotel room is entitled to the same respect as afforded one's actual home under the Fourth Amendment. *Minnesota v. Olson*, 495 U.S. 91, 99, 110 S. Ct. 1684, 109 L. Ed. 2d 85 (1990). Accordingly, "[n]o less than a tenant of a house, or an occupant of a room in a boarding house, . . . a guest in a hotel room is entitled to constitutional protection against unreasonable searches and seizures." *Stoner v. California*, 376 U.S. 483, 490, 84 S. Ct. 889, 11 L. Ed. 2d 856 (1964); *see also United States v. McNeill*, 285 F. App'x 975, 979 (3d Cir. 2008) ("a hotel room can clearly be the object of Fourth Amendment protection as much as a home or an office."); *United States v. Coles*, 437 F.3d 361, 365 (3d Cir. 2006) ("This Fourth Amendment protection extends to guests staying in hotel rooms.").

5

The Government contends, however, that Mr. Donahue lacks standing to challenge the search of his hotel room because he rented the room at the Plaza Suites Hotel under the alias "Don Roberts." The Government suggests that Mr. Donahue's "fraudulent use of the alias in renting the Plaza Suites hotel room is fatal to his claim of standing to suppress evidence seized therefrom."

Courts have recognized that an individual has an expectation of privacy in dwellings rented under an alias where the renter has exclusive control over the room and the keys. For example, in *United States v. Newbern*, 731 F.2d 744, 748 (11th Cir. 1984), the Eleventh Circuit noted: "[a]lthough the room was registered under an alias, appellants had complete control over the room. No other persons were in possession of keys to the room. Appellants' use of the motel room strictly for lodging provides the same expectation of privacy as would their home." *See also United States v. Watson*, 950 F.2d 505, 507 (8th Cir. 1991) (defendant possessed expectation of privacy in house purchased under an alias). Similarly, Judge Surrick of the United States District Court for the Eastern District of Pennsylvania recently concluded that "Defendant's use of an alias in renting Apartment 46C . . . does not negate his standing to challenge this search." *United States v. Savage*, No. 07-550, 2013 WL 271797, at *3 (E.D. Pa. Jan. 23, 2013). I find that Mr. Donahue has standing to challenge the search of his room at the Plaza Suites Hotel.

**2. The Ford Mustang**

In *United States v. Baker*, 221 F.3d 438, 442 (3d Cir. 2000), the Third Circuit considered whether "an individual who borrows a car and has control over it has a legitimate expectation of privacy." Determining whether the driver of an automobile has a reasonable expectation of privacy for Fourth Amendment standing "is a fact-bound question dependent on the strength of his interest in the car and the nature of his control over it; ownership is not necessary." *Id*. (comparing *United States v. Cooper*, 133 F.3d 1394, 1398-99 (11th Cir.

1998) (driver of a rental car whose contract to rent the car had expired four days before the search had a reasonable expectation of privacy in the car because he could have extended the contract with a simple phone call); *United States v. Angulo–Fernandez*, 53 F.3d 1177, 1179 (10th Cir. 1995) (driver who was able to produce registration papers in the name of the person from whom he claimed to have borrowed the car had standing); *United States v. Rubio–Rivera*, 917 F.2d 1271, 1275 (10th Cir. 1990) (permission from the owner to use a vehicle supports privacy expectation therein); *United States v. Garcia*, 897 F.2d 1413, 1417-18 (7th Cir. 1990) (driver using vehicle with the permission of an absent owner has a reasonable expectation of privacy therein); with *United States v. Padilla*, 111 F.3d 685, 687 (9th Cir. 1997) (defendants lacked standing to object to the search of car in which they had only a temporary "bailment interest"); *United States v. Riazco*, 91 F.3d 752, 755 (5th Cir.1996) (defendant lacked standing to object to the search of a rental car in a case in which his name was not on the rental agreement, the rental agreement had expired, and the defendant did not have permission to drive the car from the person who rented the car); *United States v. Wellons*, 32 F.3d 117, 119 (4th Cir. 1994) (driver of a rental car did not have standing to contest the search thereof because he was not listed as an authorized driver on the rental contract); *United States v. Ponce*, 947 F.2d 646, 649 (2d Cir. 1991) (defendant must show legitimate basis for possessing a car, such as permission from the car owner, to have standing); *United States v. Sanchez*, 943 F.2d 110, 113-14 (1st Cir. 1991) (because defendant failed either to show that he had the owner's permission to use the car or to demonstrate prior use or control of the car, the circumstances tipped in favor of denying the motion to suppress)).

On the other hand, "several other courts have held that the possessor of a stolen vehicle lacks standing to challenge a search of the vehicle." *United States v. White*, 504 F. App'x 168, 172 (3d Cir. 2012) (citing *United States v. Tropiano*, 50 F.3d 157, 161 (2d Cir.

1995) ("[I]t [is] obvious that a defendant who knowingly possesses a stolen car has no legitimate expectation of privacy in the car."); *United States v. Lanford*, 838 F.2d 1351, 1353 (5th Cir. 1988) (the possessor of a stolen vehicle has no standing to object to its search); *United States v. Hensel*, 672 F.2d 578, 579 (6th Cir. 1982) (per curiam) ("[T]he defendant lacked standing to challenge the search of the truck because he had no legitimate expectation of privacy in the stolen vehicle or its contents."); *United States v. Sanchez*, 635 F.2d 47, 64 (2d Cir. 1980) (defendant who did not show either that he owned the car or possessed it with permission of the owner lacked constitutionally protected interest in car)).

Considering the facts and circumstances of this case, I find that Mr. Donahue has standing to challenge the searches of the Ford Mustang and the containers found in the vehicle. The evidence of record does not support the Government's claim that Mr. Donahue lacks standing because the Ford Mustang was stolen. The only evidence cited by the Government in support of this claim is the notation in a psychiatrist's report stating that Mr. Donahue stole the vehicle. However, the owner of the Ford Mustang, Casey Donahue, Mr. Donahue's son, never reported the vehicle as stolen. In fact, Casey Donahue testified at the suppression hearing that his father always had permission to drive the vehicle. Thus, as the vehicle was not stolen, those cases that have found that an individual does not have a reasonable expectation of privacy in a stolen automobile are inapplicable to this case.

Instead, much like the defendant in *Baker*, Mr. Donahue is asserting his own expectation of privacy in the Ford Mustang. While Mr. Donahue did not own the Ford Mustang, he purchased the automobile, he always had permission to drive the Ford Mustang according to Casey Donahue, the vehicle's owner, the Ford Mustang was routinely used by Mr. Donahue and the other members of the family, and at no point in time did the

vehicle's owner forbid Mr. Donahue from using it.[2] As such, Mr. Donahue had a reasonable expectation of privacy in the Ford Mustang. Therefore, he has standing to challenge the searches of the Ford Mustang and the containers found therein.

**B.    Exceptions to the Warrant Requirement**

Because Mr. Donahue has standing to challenge the searches of his hotel room, the Ford Mustang, and the containers in the Ford Mustang, the Government also argues that the warrantless searches of the automobile were lawful pursuant to two exceptions to the warrant requirement.[3]  First, the Government maintains that the searches were lawful pursuant to the automobile exception. Alternatively, the Governments relies on the exception to the warrant requirement for inventory searches of lawfully seized automobiles.

"Where an individual possesses a reasonable expectation of privacy in a given area, typically the government must obtain a warrant prior to searching that area." *United States v. Herrold*, 962 F.2d 1131, 1137 (3d Cir. 1992). "Warrantless searches and seizures are

---

[2]    The Government also contends that a person who maintains a possessory interest in an item by fraud does not have a legitimate expectation of privacy which society will recognize. In particular, the Government suggests that Mr. Donahue lacked an expectation of privacy in the Ford Mustang because he possessed documentation identifying himself as "Don Roberts," as well a document purporting to permit "Don Roberts" to use the vehicle at the time of his arrest. However, there is no evidence in the record that Mr. Donahue actually used or attempted to use the alias "Don Roberts" in order to obtain possession of the Ford Mustang. Rather, as noted, the owner of the Ford Mustang always permitted Mr. Donahue to use the vehicle. Thus, the record does not reflect that Mr. Donahue's possession of the Ford Mustang was procured by fraud.

[3]    In initially opposing Mr. Donahue's suppression motions, the Government asserted that Mr. Donahue had checked out of the hotel room prior to his arrest. The Government concedes that the evidence at the suppression hearing demonstrates that Mr. Donahue had not, in fact, checked out of the hotel. As the Government does not otherwise contend that the search was subject to an exception to the warrant requirement, the warrantless search of the hotel room violated Mr. Donahue's Fourth Amendment rights, and the unlawfully obtained evidence will therefore be suppressed.

9

presumptively unreasonable and are therefore prohibited under the Fourth Amendment, unless an exception applies." *United States v. Mundy*, 621 F.3d 283, 287 (3d Cir. 2010) (citing *California v. Acevedo*, 500 U.S. 565, 580, 111 S. Ct. 1982, 114 L. Ed. 2d 619 (1991)). "[T]he government bears the burden of proving that a search was reasonable where, as here, that search was conducted absent a warrant." *United States v. Headen*, 264 F. App'x 244, 246 (3d Cir. 2008) (citing *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995)).

### 1. The Automobile Exception

The Government first argues that the searches of the Ford Mustang and the containers found therein were lawful pursuant to the automobile exception to the warrant requirement. "The automobile exception to the warrant requirement permits law enforcement to seize and search an automobile without a warrant 'if probable cause exists to believe it contains contraband.'" *United States v. Burton*, 288 F.3d 91, 100 (3d Cir. 2002) (quoting *Pennsylvania v. Labron*, 518 U.S. 935, 940, 116 S. Ct. 2485, 135 L. Ed. 2d 1031) (1996)). The *Labron* Court explained that the automobile-exception is premised on the "readily mobile" nature of automobiles, which provides a form of exigency that excuses the need to obtain a warrant. *Labron*, 518 U.S. at 940, 116 S. Ct. 2485 ("Our first cases establishing the automobile exception to the Fourth Amendment's warrant requirement were based on the automobile's 'ready mobility,' an exigency sufficient to excuse failure to obtain a search warrant once probable cause to conduct the search is clear. More recent cases provide a further justification: the individual's reduced expectation of privacy in an automobile, owing to its pervasive regulation. If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment thus permits police to search the vehicle without more.") (citations omitted).

To find probable cause to conduct a search, "there needs to be a 'fair probability that

contraband or evidence of a crime will be found in a particular place.'" *Burton*, 288 F.3d at 103 (quoting *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983)).

> [P]robable cause can be, and often is, inferred by considering the type of crime, the nature of the items sought, the suspect's opportunity for concealment and normal inferences about where a criminal might hide the fruits of his crime. . . . A court is entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense.

*United States v. Hodge*, 246 F.3d 301, 305-06 (3d Cir. 2001) (internal citations and quotations omitted).

The Government submits that there was probable cause to search the Ford Mustang at the time of Mr. Donahue's arrest on January 20, 2011. According to the Government:

> The car itself is evidence relevant to establishing the crime, together with all the articles of property contained therein. Seen from the perspective of the ongoing criminal investigation, there is probable cause to believe that the contents of the vehicle were likely related to the crime under investigation. Almost anything contained therein is by definition contraband of the crime. Was there a change of clothing in a duffle bag? That would be proof that Donahue had planned ahead. Are there receipts from hotel rooms, restaurants, or gas stations contained inside the glove compartment? Proof of locations visited by the defendant while a fugitive from justice. Cash in the car? Evidence that Donahue was prepared for life on the road as a fugitive. Maps, cellular telephones (and call records contained therein), personal grooming items (indicating how long the defendant intended to be on the road), items for changing his appearance, medications, or any other things contained in bags located in the trunk of the car? All such items are contraband and important to prove Donahue's plan and state of mind. Anything possessed by Donahue at the time of his capture is in some way related to his fugitive status. The car and any items contained in the car would have aided him in his continued status of fugitive from justice. Moreover, it is reasonable to conclude that Donahue would have kept everything he needed to remain a fugitive either directly on his person or in his car while on the run from authorities. In short, there was probable cause to believe that Donahue was engaged in criminal activity and that the vehicle contained contraband.

(Doc. 188, 19-20.)

Simply put, the Government lacked probable cause to search the Ford Mustang. At the time of Mr. Donahue's arrest, he was wanted for failure to surrender for service of sentence pursuant to a court order in violation of 18 U.S.C. § 3146(a)(2) and (b)(1)(A)(i). In order to be convicted of a violation of 18 U.S.C. § 3146(a)(2), the Government must

11

prove the following elements: (1) that the defendant was previously convicted of a crime in this Court; (2) that the defendant had been released on his own recognizance on condition that the defendant surrender for service of sentence; (3) that the defendant thereafter failed to surrender for service of sentence as required; and (4) that the defendant knew he was required to surrender for service of sentence on that date and purposefully and knowingly failed to do so. *See Fifth Circuit Pattern Jury Instructions (Criminal Cases)* § 2.86 (2012).

In view of the elements of the crime for which Mr. Donahue was wanted at the time of his arrest on January 20, 2011, Mr. Donahue's crime was completed after he failed to surrender for service of his sentence. As a result, there was not a fair probability that a search of the Ford Mustang would reveal contraband or evidence of a crime. That is, the known facts and circumstances were insufficient "to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime [would] be found" by searching the Ford Mustang or its containers. *Ornelas v. United States*, 517 U.S. 690, 696, 116 S. Ct. 1657, 134 L. Ed. 2d 911 (1996) (citing *Brinegar v. United States*, 338 U.S. 160, 175-76, 69 S. Ct. 1302, 93 L. Ed. 1879 (1949); *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983)). Indeed, Deputy U.S. Marshal Archuleta testified at the evidentiary hearing that he searched the Ford Mustang and seized its contents not because he believed he had probable cause, but rather because he was instructed to do so by Deputy U.S. Marshal Summa in Scranton. Furthermore, the items in the Ford Mustang viewed by Deputy U.S. Marshal Archuleta, such as maps, newspapers, clothing, and food items, are not contraband, and these items did not provide the United States Marshals Service with probable cause to believe that the Ford Mustang contained contraband.[4] As the United

---

[4] Black's Law Dictionary defines "contraband," in part, as "[g]oods that are unlawful to import, export, produce, or possess." Black's Law Dictionary 365 (9th ed. 2009). "Contraband *per se*" is "[p]roperty whose possession is unlawful regardless of how it is used," while "derivative contraband" is "[p]roperty whose

12

States Marshals Service lacked probable cause to search the Ford Mustang or the containers found therein, the automobile exception to the warrant requirement does not apply.

### 2. Inventory Searches

The Government next argues that the January 20, 2011 and January 21, 2011 searches of the Ford Mustang, as well as the search of the closed containers seized from the vehicle on January 25, 2011, were lawful inventory searches.

Another exception to the warrant requirement is for inventory searches of lawfully seized automobiles. *Colorado v. Bertine*, 479 U.S. 367, 371, 107 S. Ct. 738, 93 L. Ed. 2d 739 (1987); *Illinois v. Lafayette*, 462 U.S. 640, 643, 103 S. Ct. 2605, 77 L. Ed. 2d 65 (1983) ("[T]he inventory search constitutes a well-defined exception to the warrant requirement."); *South Dakota v. Opperman*, 428 U.S. 364, 372, 96 S. Ct. 3092, 49 L. Ed. 2d 1000 (1976) ("[I]nventories pursuant to standard police procedures are reasonable."). Inventory procedures serve three "strong governmental interests": "to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." *Bertine*, 479 U.S. at 372, 107 S. Ct. 738.

To be lawful, inventory procedures "must be 'conducted according to standardized criteria,' or established routine, consistent with the purpose of a non-investigative search." *United States v. Mundy*, 621 F.3d 283, 287 (3d Cir. 2010) (quoting *Bertine*, 479 U.S. at 374 n.6, 107 S. Ct. 738). "The criteria or routine must limit an officer's discretion in two ways: first, as to whether to search the vehicle, and second, as to the scope of an inventory search." *Id*. at 288 (citations omitted). These limitations ensure that inventory searches are not turned into purposeful and general means of discovering evidence of a crime. *See id*.

The United States Marshals Service Policy Directives provides, in pertinent part:

---

possession becomes unlawful when it is used in committing an illegal act." *Id*.

**IMPOUNDMENT INVENTORY**

A. Deputies usually do not become involved in the storage and custody of automobiles. These functions are properly assigned to state and local authorities.

B. However, situations are conceivable in which deputies have the legal duty to arrange for the storage of a vehicle to protect it and its contents. For example, when a subject is arrested in his or her vehicle away from home, the subject cannot personally arrange for its storage, the vehicle cannot be left at the arrest scene, *local authorities are unavailable or unwilling to take possession of the vehicle*, and no independent legal justification exists for seizing the car, deputies have legal responsibility to ensure the safekeeping of the vehicle. *The rational for the impounding of the vehicle must no [sic] be based upon a search for incriminating evidence.*

(*Suppression Hearing*, Ex. 20 (emphasis added).) The United States Marshals Service Policy Directives is silent as to whether closed containers found in automobiles should be opened and their contents inventoried. (*Id.*)

Here, the evidence presented at the suppression hearing confirms that the Ford Mustang was seized on January 20, 2011 not to inventory its contents, but rather to conduct an investigatory search. While "[t]he mere fact that an inventory search may also have an investigatory purpose does not . . . invalidate it," *United States v. Frank*, 864 F.2d 992, 1001 (3d Cir. 1988) (citation omitted), the entire purpose of the search of the Ford Mustang in this case was to uncover incriminating evidence. First, U.S. Deputy Marshal Archuleta decided to impound the Ford Mustang not because of the United States Marshals Service Policy Directives, but rather because he was directed to do so by U.S. Deputy Marshal Summa of Scranton, Pennsylvania. As such, it cannot be said in this case that U.S. Deputy Marshal Archuleta's search of the Ford Mustang was non-discretionary. Second, impounding vehicles under the United States Marshals Service Policy Directives is "conceivable" when "local authorities are unavailable or unwilling to take possession of the vehicle." In this case, however, the New Mexico State University Police were willing to take possession of the vehicle and were preparing to tow the Ford Mustang until U.S. Deputy Marshal

14

Archuleta received a call from Scranton to seize the vehicle. In fact, the New Mexico State University Police had already called for a tow truck before the United States Marshals Service decided to seize the vehicle. Third, U.S. Deputy Marshal Archuleta testified at the suppression hearing that he was going to leave the Ford Mustang with the New Mexico State University Police until he was informed by his supervisor and U.S. Deputy Marshals in Scranton that the vehicle would be wanted for evidentiary purposes. The seizure and subsequent search of the Ford Mustang on January 20, 2011 was not based on a desire to protect Mr. Donahue's property, to guard officers from danger, or to insure against lost or stolen property. Instead, the record demonstrates that the purported inventory search of the Ford Mustang was, in actuality, a warrantless investigatory search for incriminating evidence.

In addition, as detailed above, the day after the United States Marshals Service searched the Ford Mustang and seized evidence from it, the FBI conducted a second search of the vehicle. The Government argues that Supervisory Special Agent Willeke's search of the Ford Mustang on January 21, 2011 was also a lawfully inventory search because she testified at the evidentiary hearing that she performed the search pursuant to FBI protocol. However, it is not apparent from the portions of the Federal Bureau of Investigation Inventory Policy submitted by the Government that the policy mandates the inventory of a vehicle and its containers after it has already been inventoried by another law enforcement agency. (*Suppression Hearing*, Ex. 21.) And, the FD-302 prepared by Supervisory Special Agent Willeke for the events on January 21, 2011 suggests that she did not intend to re-inventory the Ford Mustang after it had previously been inventoried by the United States Marshals Service. That FD-302 states that Supervisory Special Agent Willeke "returned to *photograph* the vehicle . . . . While driving described vehicle, undersigned agent saw a CD and papers above the passenger side sun visor. These items

were not seized upon arrival at the LCRA because undersigned agent believed at the time that the USMS *had seized* all evidentiary items." (*Suppression Hearing*, Ex. 23 (emphasis added).) Furthermore, the Government's claimed inventory search of the Ford Mustang by the FBI is undermined by the fact that the FBI x-rayed the vehicle, and also that Senior Supervisory Agent Willeke did not seize the paperwork and C.D. found above the passenger side visor until she was instructed to do so by a case agent in the Philadelphia Division on January 24, 2011. Thus, as with the January 20, 2011 search of the Ford Mustang by the United States Marshals Service, the FBI's search of the vehicle on January 21, 2011 was not an inventory search of a lawfully seized automobile.[5] As a result, the subsequent search of the closed containers on January 25, 2011 was also unlawful.

### 3. The Exclusionary Rule and Inevitable Discovery

As discussed, the automobile exception to the warrant requirement does not apply to this case, and the searches of the Ford Mustang were not lawful inventory searches. Moreover, the Government fails to cite any other exceptions to the warrant requirement which would justify the warrantless search of the Ford Mustang. The unlawful searches and seizure of evidence implicate the exclusionary rule and its recognized exceptions.

Absent an exception to the exclusionary rule, evidence obtained as a result of a violation of a criminal defendant's Fourth Amendment rights must ordinarily be suppressed

---

[5] The Government also suggests that even if the seizure and search of the Ford Mustang by the FBI on January 21, 2011 was not a lawful inventory search, probable cause existed to search the vehicle. As described in detail above, however, the automobile exception to the warrant requirement does not apply in this case because law enforcement authorities lacked probable cause to search the Ford Mustang. And, to the extent that the Government asserts that probable cause existed to search the Ford Mustang because of the discovery of the magazine clip in the vehicle, that argument disregards the fact that the magazine clip was found only after the FBI unlawfully possessed the Ford Mustang by seizing it from a public tow yard without probable cause or a warrant.

16

as "fruit of the poisonous tree." *See Wong Sun v. United States*, 371 U.S. 471, 487-88, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). "[T]he exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'" *Segura v. United States*, 468 U.S. 796, 804, 104 S. Ct. 3380, 82 L. Ed. 2d 599 (1984). The fruit of the poisonous tree doctrine does not permit exclusion of evidence "simply because 'it would not have come to light but for the illegal actions of the police.'" *Segura*, 468 U.S. at 815, 104 S. Ct. 3380 (quoting *Wong Sun*, 371 U.S. at 487-88, 83 S. Ct. 407). The proper test for exclusion of evidence is "whether, granting the establishment of the primary illegality, the evidence . . . has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun*, 371 U.S. at 487-88, 83 S. Ct. 407.

Here, the evidence found in Mr. Donahue's vehicle, including the firearm, was fruit of the unlawful searches of the Ford Mustang. Although the firearm was not uncovered during the initial search of the vehicle, its discovery was derivative of the illegal searches and seizures of the Ford Mustang and its contents. Thus, the evidence is required to be suppressed unless an exception to the exclusionary rule applies.

The Government contends that the evidence need not be suppressed pursuant to the inevitable discovery exception to the exclusionary rule. Under this exception, "if the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rationale has so little basis that the evidence should be received." *United States v. Vasquez De Reyes*, 149 F.3d 192, 195 (3d Cir. 1998) (quoting *Nix v. Williams*, 467 U.S. 431, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984)). The Government can satisfy its burden by demonstrating "that the police, following routine procedures, would inevitably have

17

uncovered the evidence." *Vasquez De Reyes*, 149 F.3d at 195. This exception focuses on "historical facts capable of ready verification, and not speculation." *Id*.; *see Nix*, 467 U.S. at 444 n.5, 104 S. Ct. 2501.

At the time of Mr. Donahue's arrest, the New Mexico State University Police were in the process of making arrangements to have the Ford Mustang towed, which was standard procedure following an arrest. The Government thus reasons:

> The Ford Mustang at issue would have been impounded and searched in accord with the New Mexico State University Police department policies. Regardless of the legality of the search of the car pursuant to the vehicle exception to the warrant requirement, the items (including the firearm) found would have been discovered by authorities.

(Doc. 188, 23.) Therefore, the Government concludes that the evidence would have been discovered absent any constitutional violations.

The Government fails to establish that the inevitable discovery exception is applicable in this case. While the testimony at the suppression hearing indicated that the New Mexico State University Police's standard procedure is to impound a vehicle after an arrest like that at issue in this case, the record is silent as to the existence and/or particulars of the inventory policy of the New Mexico State University Police. Without evidence of such a policy, it is unclear whether the New Mexico State University Police would have inventoried the contents of the Ford Mustang. Additionally, even if the Ford Mustang was inventoried by the New Mexico State University Police,[6] it is unknown whether the policy would have permitted or required the closed containers found in the Ford Mustang to have been opened and inventoried. As such, the inevitable discovery exception does not apply in this case because it is entirely speculative that the New Mexico State University Police

---

[6] Had the vehicle been searched and inventoried by the New Mexico State University Police, it is not apparent that the magazine clip would have been discovered in view of the fact that the magazine clip was not discovered during the search of the Ford Mustang on January 20, 2011.

18

would have discovered the contents of the Ford Mustang and the closed containers found therein. Thus, because the Government failed to present evidence of the New Mexico State University Police's inventory policy, it has not satisfied its burden of demonstrating that the evidence, including the firearm, would inevitably have been discovered. Invocation of the inevitable discovery exception is not merited on the facts of this case.

Therefore, because the seizures and searches of the Ford Mustang and the containers found in the Ford Mustang between January 20, 2011 and January 25, 2011 were unlawful, and as no exceptions to the exclusionary rule apply, the illegally obtained evidence will be suppressed.

### III. Conclusion

For the above stated reasons, Mr. Donahue's Motion to Suppress all Evidence Seized Pursuant to Search of Car Seized in Violation of Fourth Amendment Rights (Doc. 41) and his Supplemental Motion to Suppress Evidence Obtained from Unlawful Search of Hotel Room, Unlawful Search and Seizure of Vehicle, and Unlawful Search of Closed Containers (Doc. 98) will be granted.

An appropriate order follows.


<u>November 19, 2013</u>  /s/ A. Richard Caputo
Date  A. Richard Caputo
 United States District Judge